1          IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF UTAH

3                   NORTHERN DIVISION

4

5   CHRISTOPHER JOSEPH TUVELL,        )

6   individually and as the heir of  )

7   David Christopher Tuvell, et al.,)

8           Plaintiffs,              )

9   vs.                             )   CASE NO. 1:12-CV-128DB

10  BOY SCOUTS OF AMERICA, et al.,   )

11          Defendants.             )

12  _____)

13

14

15          BEFORE THE HONORABLE DEE BENSON

16          --------------------------------

17                   April 23, 2014

18

19                   Motion Hearing

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

    For Plaintiff:              ALTON J. HALL
 3                              528 West 21st Avenue
                                Covington, Louisiana
 4

 5

 6                              ROBERT GILCHRIST
                                900 Parkside Tower
 7                              215 South State Street
                                Salt Lake City, Utah
 8

 9

10  For Defendant:             DAVID CONCANNON
    Blue Water                 200 Eagle Road
11                             Suite 116
                               Wayne, Pennsylvania
12
                               GAINER WALDBILLIG
13                             405 South Main Street
                               Suite 930
14                             Salt Lake City, Utah

15

16
    For Defendant:             MIKE COLLINS
17  Kim LaMotte-Malone         215 South State
                               Suite 600
18                             Salt Lake City, Utah

19                             AMANDA ROSENTHAL
                               2300 W. Sahara Avenue
20                             Suite 400
                               Las Vegas, Nevada
21

22
    For Defendant:             ROGER BULLOCK
23  P.A.D.I.                   SPENCER BROWN
                               102 South 200 East
24                             Suite 800
                               Salt Lake City, Utah
25
```

```
 1   For Defendant:              MICHAEL SKOLNICK
     Boy Scouts of America       SAMUEL GOBLE
 2                               10 Exchange Place
                                 Salt Lake City, Utah
 3

 4   For Defendant:              ERIC DAVENPORT
     M.P.                        1218 East 7800 South
 5                               Suite 300
                                 Sandy, Utah
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:             Ed Young
                                 247 U.S. Courthouse
24                               350 South Main Street
                                 Salt Lake City, Utah 84101-2180
25                               801-328-3202
```

```
1    April 23, 2014                              2:00 p.m.

2                      P R O C E E D I N G S

3

4         THE COURT:   Christopher Joseph Tuvell and others

5    versus Boy Scouts of America and others, 12-CV-128.

6         The Court has two matters to hear oral argument

7    on.  One is the motion by the Blue Water defendants against

8    plaintiffs and defendant Professional Association of Diving

9    Instructors and their counsel seeking sanctions, and the

10   other motion is the motion of third-party defendants Kim

11   LaMotte-Malone, M.D. and others, which moves to dismiss the

12   third amended complaint against them.  I think maybe we

13   should take that motion up first.

14        Before I hear argument on that, let me ask all of

15   the counsel here representing the various parties to stand

16   and introduce yourselves so that I have it straight and so

17   that the record has it straight, beginning over here.

18        MR. HALL:  Good afternoon, Your Honor.  My name is

19   Alton Hall and I represent the Tuvell family.

20        MR. GILCHRIST:  Bob Gilchrist, co-counsel for the

21   Tuvell family.

22        THE COURT:  Thank you.

23        MR. CONCANNON:  Good afternoon, Your Honor.  My

24   name is David Concannon and I represent Corbett Douglas and

25   Blue Water Scuba of Logan and Lowell Huber, also known as
```

```
1    the Blue Water defendants.

2              THE COURT:  Okay.

3              MR. WALDBILLIG:  I'm Gainer Waldbillig also for --

4              THE COURT:  Hold on just a second.

5              David Concannon.  All right.  You have the Blue

6    Water Scuba defendants?

7              MR. CONCANNON:  That is correct.

8              MR. WALDBILLIG:  Gainer Waldbillig for the same

9    defendants.

10             THE COURT:  You are from Salt Lake and you are

11   from Pennsylvania?

12             MR. CONCANNON:  That is correct, Your Honor.

13             THE COURT:  Nice to have you here.

14             Yes, sir.

15             MR. COLLINS:  Good afternoon, Your Honor.  I'm

16   Mike Collins.  I am local counsel for Kim LaMotte-Malone,

17   LaMotte Pediatrics, Anthem Hills Pediatrics, Kim

18   LaMotte-Malone M.P. Professional Corporation and Brian K.

19   Shrawder.

20             MS. ROSENTHAL:  I am Amanda Rosenthal for those

21   same parties as well.

22             THE COURT:  You're here from Las Vegas, Ms.

23   Rosenthal, right?

24             MS. ROSENTHAL:  Yes.

25             MR. BULLOCK:  Good afternoon, Your Honor.  Roger
```

1   Bullock and Spencer Brown, Strong & Hanni, for Professional

2   Association of Dive Instructors.

3           THE COURT:  Okay.  How do you say the acronym,

4   P.A.D.I.?

5           MR. BULLOCK:  That works for me, Your Honor.

6           THE COURT:  Counsel?

7           MR. SKOLNICK:  Michael Skolnick for Boy Scouts of

8   America, Great Salt Lake Council and Michael Perry, and with

9   me also is attorney Sam Goble.

10          THE COURT:  Okay.  Is it the three of you that

11  represent the Boy Scouts?

12          MR. SKOLNICK:  Myself and Mr. Goble.

13          THE COURT:  Okay.

14          MR. DAVENPORT:  Eric Davenport representing the

15  minor defendant, M.P.

16          THE COURT:  Was there a Mr. Perry?  Mr. Skolnick

17  you said something about that you represent the defendant

18  Perry?

19          MR. SKOLNICK:  Third-party defendant, Michael

20  Perry.

21          THE COURT:  Okay.

22          MR. SKOLNICK:  Yes, Your Honor.

23          THE COURT:  I want to hear argument first on the

24  third-party defendant's motion.

25          Ms. Rosenthal, does that mean you're up to bat

1   first?

2                MS. ROSENTHAL:  It does.

3                THE COURT:  Okay.  We are actually using most of

4   those tables.

5                Why didn't you sit at a table?

6                UNIDENTIFIED SPEAKER:  In case I need to speak

7   with my co-counsel.

8                THE COURT:  We actually ran out of room.

9                MR. SKOLNICK:  We didn't want to put him on the

10  plaintiffs' side, Your Honor.

11               THE COURT:  It is like a wedding.

12               Ms. Rosenthal, please.  I have read your briefs

13  and I think I have the background down pretty well.  I would

14  like to hear anything that you want to say.

15               MS. ROSENTHAL:  I think that the briefing spells

16  it out pretty clearly, and if you have questions about

17  specific facts, but I think there is no basis in this case

18  for exercising specific personal jurisdiction.  David Tuvell

19  was a Boy Scout and Dr. LaMotte and her practice were his

20  primary care providers in Nevada.  He was a Nevada resident.

21  He sought treatment from them in Nevada.

22               Although Mr. Shrawder signed a Boy Scout of

23  America form on October 1st, 2010, there is nothing on there

24  that says he is going to be going to Utah for scuba diving.

25  There is no indication that he knew they would be going to

1    Utah, and even if they did know, that is not a basis for

2    personal jurisdiction, specific personal jurisdiction.  They

3    did nothing with Utah in this case.

4            I think the third-party plaintiffs are trying to

5    get general personal jurisdiction, and the United States

6    Supreme Court just clarified that standard in the Daimler

7    opinion.  We filed a notice of supplemental authority on

8    that.  It is a very high standard to meet.  The touchstones

9    for a corporation or individuals where they live and for the

10   corporation is where they are incorporated and licensed to

11   do business and that is all in Nevada.

12           There is some discussion of whether they take

13   Nevada or Utah insurance, but they are contracted with a

14   larger network and those networks contract with those Utah

15   companies.  No matter what, these people would have to come

16   to Nevada for treatment and they don't do anything with

17   Utah.  They have this passive Web site that says, hey, this

18   is our practice, come and see us in Nevada, and that is all

19   it is.

20           Unless you have other questions --

21           THE COURT:  I don't.  Thank you, Ms. Rosenthal.

22   Let me hear from the other side.

23           Mr. Concannon, is that going to be you?

24           MR. CONCANNON:  Yes, Your Honor.

25           THE COURT:  Please.

1          It sounds like all you want is to have some time

2     to do some discovery?

3          MR. CONCANNON:  That is correct, Your Honor.

4          We acknowledge that there is no general

5     jurisdiction here.  The issue really is whether or not there

6     is specific jurisdiction -- sorry for the feedback -- and

7     specifically whether or not the third-party defendants'

8     conduct is directed at the forum.  We believe that there is

9     a reasonable basis to allege that it is.  The reason for

10    that is that David Tuvell was a sick young man.  He was very

11    ill in 2010 and he was treated by the doctor and by the

12    physician's assistant for a period of six months.  The form

13    was signed off on on October 1st, 2010, and at that time

14    there was no place in Nevada for anybody to go scuba diving

15    with the Boy Scouts.

16          The standard of care that is applicable to Mr.

17    Shrawder and to the doctor is that when a child has asthma

18    it is a contraindication to diving.  He should have asked.

19    Where do you intend to go diving?  There should have been

20    medical tests performed.  We would simply like to explore

21    those issues to determine did he ask those questions and, if

22    so, what were the answers.  That might lead us to specific

23    jurisdiction.  It is just that simple.

24          THE COURT:  Thank you, Mr. Concannon.

25          MR. CONCANNON:  Thank you.

 1          THE COURT:  The motion to dismiss is granted.  I

 2    don't find that there is enough of a basis for even allowing

 3    discovery on it.

 4          Let's go to the next motion.  Who is going to be

 5    addressing that?

 6          MR. CONCANNON:  That would be me again.

 7          THE COURT:  Okay.  You're zero for one, but this

 8    is a different issue.

 9          Please proceed.

10          MR. CONCANNON:  Thank you.  I'll be brief because

11    I have a 5:00 flight.

12          THE COURT:  Okay.

13          MR. CONCANNON:  I will make it simple.

14          THE COURT:  Take all the time you need.

15          MR. CONCANNON:  Just to clarify, Your Honor, our

16    motion is asking for four things.  Number one, an order

17    dismissing all of the plaintiffs' claims against P.A.D.I.

18    retroactive to March 11, 2013, and striking the plaintiffs'

19    amended complaint, and we want to set the procedural clock

20    back to where it should be.

21          Two, once the Court has restored the proper

22    procedural posture, allowing a reasonable time for the Blue

23    Water defendants to file a responsive pleading.  We'll

24    acknowledge right now that it is likely that we will simply

25    provide the notices for allocation of fault rather than go

1  through all the cross-claims and third-party claims if that

2  happens.  I have had a discussion with Mr. Waldbillig, but

3  that is where we are leaning.

4         Third is to strike or modify the protective order

5  entered on August 28th, 2013, and that is docket number 99,

6  and to make it consistent with the protective order entered

7  on April 16th, 2014, which is docket number 153.

8         Fourth, an order that --

9         THE COURT:  Tell me exactly how, and it wasn't

10  clear to me from the briefing, what you want me to do to

11  modify the protective order.

12         MR. CONCANNON:  We believe that the only thing

13  that arguably could be kept confidential and protected from

14  disclosure is the amount paid for the settlements.  If truly

15  the purpose of the protective order is to encourage

16  settlements, that by protecting the amount paid that we can

17  do that.  The order that was recently entered says that the

18  amount paid is the confidential information and everything

19  else is not, and that relieves an enormous administrative

20  burden on the remaining defendants and as far as the court's

21  filings are concerned and we don't have to go through all

22  that rigmarole.

23         THE COURT:  Okay.

24         MR. CONCANNON:  Fourth, an order that counsel for

25  plaintiffs and P.A.D.I. pay the Blue Water defendants

1    reasonable attorneys' fees and costs incurred in responding

2    to the amended complaint and making this motion and

3    answering the counterclaims.

4              I would like to start with the question of

5    standing and the Court's jurisdiction.  Article Three

6    confers standing on a plaintiff and jurisdiction to this

7    court, Article Three of the Constitution, when there is a

8    case or a claim upon which a plaintiff can come to court and

9    seek compensation for that claim.  That is the fundamental

10   basis of Article Three jurisdiction.  That is the reason why

11   once a case is settled, the plaintiff no longer has standing

12   to pursue a claim because they have received redress for

13   their harm.  This is Luhan versus Defenders of Wildlife,

14   1992, United States Supreme Court.

15             Once the plaintiffs settled with P.A.D.I. on

16   March 11, 2013, the next step, pursuant to all of the

17   federal case law and all of the federal rules and the local

18   rules, was to immediately notify the Court and the parties

19   of that settlement.  The reason for that is that the

20   plaintiff no longer has standing to pursue those claims and

21   the Court no longer has jurisdiction over those claims.

22   What is important is that you maintain the right procedural

23   posture and you don't unnecessarily multiply the

24   proceedings.

25             That didn't happen in this case.  What happened

1    instead was that the plaintiff asked for leave to file an

2    amended complaint, dismissing some of the settled claims

3    against P.A.D.I., but they didn't acknowledge that there was

4    a settlement, and maintaining the facade of litigation and

5    maintaining two additional claims.  What the plaintiff

6    represented to the Court and to the parties at that time was

7    that the amendment was necessary to remove disputed claims.

8    They didn't say we have settled them.

9            Then that misleading, in our opinion, filing was

10   compounded by P.A.D.I.'s response, which was to acquiesce to

11   that filing.  P.A.D.I. didn't come forward and say that

12   there had been a settlement of all claims and there was no

13   further case and controversy.  Then we have some additional

14   procedural motions and eventually we answered the amended

15   complaint and the Court granted leave to do that, but what

16   was important about the amended complaint was that it

17   completely changed the plaintiffs' theory of recovery

18   against the Water defendants.

19           It was no longer alleged that they had provided a

20   defective product, the P.A.D.I. Discover Scuba Diving

21   program.  Now it was alleged that they had defectively

22   provided a product which was apparently now okay.  Whether

23   or not the P.A.D.I. Discover Scuba Diving program is safe is

24   a hotly contested issue in this case.  The burden was taken

25   off of the plaintiffs to prove that it wasn't save and

1    placed on the Blue Water defendants.  Then they had to prove

2    that they had provided something in a safe manner.  We

3    recognized that and we mentioned that, but we also

4    recognized that the plaintiff has the right to file an

5    amended complaint before an answer was filed, so that it was

6    likely that that motion was going to be granted, and we were

7    not going to quibble with that, but we brought it to the

8    Court's attention.  We didn't know that everything had been

9    settled.

10            THE COURT:  Can you enumerate what you think you

11   have been burdened with because you were not told and were

12   misled about the extent of the settlement?

13            MR. CONCANNON:  Yes.

14            We filed an answer to the amended complaint and

15   started cross-claims against P.A.D.I.  We were deprived of

16   the opportunity to evaluate the $800,000 payment that had

17   been made to the plaintiffs and whether or not it was

18   necessary to file those cross-claims against somebody that

19   is now still a party to the case, and had they not been a

20   party we would have had the opportunity to simply allocate

21   fault against them under Utah law, and that was a decision

22   that was taken away from us by the settling defendants by

23   keeping their settlement a secret and maintaining the facade

24   of a case against P.A.D.I. when everything had been settled.

25            P.A.D.I. then filed an answer and cross-claims

1    against the Blue Water defendants, which we had to answer,

2    and we went forward and we eventually learned of a

3    settlement, which we thought was a partial settlement

4    because of the pleadings, and then there was some discussion

5    back and forth about a protective order, which never in my

6    23 years of litigation did I think that there was a

7    collusion clause or some kind of clause that said that the

8    defendants got to decide when a case was dismissed and not

9    the rules or the Court.

10           We went along this path and we agreed to a

11   protective order.  Then we found out what the language of

12   the settlement agreement really said and what burdens were

13   placed on us and then we had to make this motion.  Here we

14   are 13 months later with the wrong procedural posture in

15   this case, with cross-claims and third-party claims and all

16   sorts of a mess that really didn't have to happen.

17           THE COURT:  Right.  All you have really identified

18   for me is the answer and cross-claims and --

19           MR. CONCANNON:  And the making of this motion.

20           THE COURT:  Right.  That is pretty much it.

21           MR. CONCANNON:  Right.

22           We don't ask for sanctions lightly.  I know

23   Mr. Hall and we are going great white shark diving together

24   in August.  I am reluctant to ask for sanctions, but we

25   think that really where things went off the rails, and where

1    there was intentional misconduct that is sanctionable, was

2    in the filing of the amended complaint and the misleading of

3    the parties and taking us down this procedural road that we

4    didn't have to go on.  That is what merits sanctions in our

5    view.

6              THE COURT:  What do you think that cost you and

7    your client?

8              MR. CONCANNON:  I would like to say it is

9    somewhere in the neighborhood of $10,000 if we include the

10   filing of this motion and coming out here for this and the

11   replies and whatnot.

12             THE COURT:  If you don't include this motion, and

13   did you have communication with the plaintiff and P.A.D.I.

14   about this to see if they would be willing to resolve it

15   short of your filing this motion?

16             MR. CONCANNON:  Not specifically.  We were led to

17   believe that they were going to be pretty stubborn about

18   maintaining these claims, because it was their view that

19   they had the right to do so until the trial.

20             THE COURT:  As you understand the law that is

21   applicable here, if P.A.D.I. is being accused by you and

22   your clients of being largely at fault here, and they want

23   to stay in the case, and they claim in their briefing that

24   they are allowed to stay in and defend themselves, correct?

25             MR. CONCANNON:  Well, they claim that they are

1    allowed to stay and defend themselves against the

2    cross-claims that were asserted after the settlement.

3              THE COURT:  That is I guess what I'm getting at.

4    If those are gone, if they are no longer a defendant so they

5    are not a co-defendant so they can't have a cross-claim

6    against them, am I correct in understanding what you said a

7    few minutes ago that you're not planning to bring a

8    third-party complaint against them?

9              MR. CONCANNON:  Mr. Waldbillig and I have

10   discussed this, and we believe that if the procedural

11   posture is restored to where it should be, that we can

12   achieve what we want, which is an allocation of fault.

13             THE COURT:  That gets me to my question.  How does

14   a party like P.A.D.I., what does it do to defend itself

15   under those circumstances where it is no longer a party?

16             MR. CONCANNON:  Well, it is my understanding that

17   they can still defend themselves in depositions and they can

18   still assert that the product is safe, and the plaintiff is

19   asserting that the product is safe, and that is their

20   contention now, that the product is safe but it was

21   delivered in an unsafe manner.  So the plaintiff is free to

22   carry the water for them, if that is what they would like to

23   do, and that is the agreement they made, but P.A.D.I. is not

24   restricted from protecting itself or defending itself.

25             THE COURT:  Would it be a presence at the trial?

1              MR. CONCANNON:  I would have to defer to Mr.

2     Waldbillig for that procedural question under Utah law.

3              THE COURT:  I think they just become an empty

4     chair.

5              MR. CONCANNON:  That is my understanding, but I am

6     not as familiar as he is.

7              THE COURT:  Thank you, Mr. Concannon.  That is

8     very helpful.

9              Who is going to address it here?  Mr. Hall?

10             MR. HALL:  Yes, Your Honor.  Greetings from New

11    Orleans and thank you for allowing us to be heard today.

12             I have read all of these pleadings and after

13    wading through the distortions and the half-truths and

14    deceptions and innuendo and outright untruths, it seems to

15    me that what the Blue Water defendants have are two primary

16    complaints.  The first is that the plaintiff and P.A.D.I.

17    entered a so-called secret agreement that somehow caused

18    them extra substantial work and expense, and we just heard

19    Mr. Concannon talk about the fact when you asked him

20    specifically what is it that you had to do, and he talked

21    about having to file the third-party complaint and these

22    other actions, but that is just simply not so.

23             To suggest first that the plaintiffs were keeping

24    the settlement secret ignores the fact that this Court and

25    all parties were advised by me of the settlement in open

1    court before Blue Water even filed an answer.  We didn't

2    collude with anyone.  We settled our case with P.A.D.I. and

3    immediately amended our complaint to avoid wasting judicial

4    time addressing the issues that were made moot by the

5    settlement.

6            Specifically what I mean is P.A.D.I. had a motion

7    pending to dismiss four or five of the causes and instead of

8    the Court having to hear that motion, we withdrew them.  But

9    for this hearing not a moment of judicial time has been

10   spent as a result of this settlement.  The Blue Water

11   defendants picked this battle.  They have compounded and

12   complicated this litigation expedientially naming numerous

13   third-party defendants and asserting claims and

14   cross-claims.  To suggest that the plaintiffs have placed

15   some litigation burden on Blue Water is just false.  The

16   bottom line is that Blue Water was aware of the settlement

17   before they filed a single responsive pleading.  The time

18   line that you just heard is not the correct time line.

19           We advised the Court and all parties of the

20   settlement on May 29th.  These third-party complaints and

21   responsive pleadings and everything filed by Blue Water was

22   in June.  Your Honor, not a single pleading relative to this

23   matter was filed between the time of the actual settlement

24   in March and the time that it was disclosed to this Court.

25           THE COURT:  Explain to me why after you settled

1    the case with P.A.D.I. you moved to amend your complaint and

2    include in it a negligence and failure to warn claim against

3    P.A.D.I.

4          MR. HALL:  Well, what we did, Your Honor, was the

5    failure to warn and the negligence were two of several of

6    the allegations that were in the original complaint.  What

7    we did to amend was to remove all of the complaints and all

8    of the allegations that were the subject of a then pending

9    motion to dismiss.  We didn't want the Court to have to

10   decide a motion to dismiss on things that had been resolved.

11         THE COURT:  Fair enough, but isn't it just a

12   simple fact that you had settled completely with P.A.D.I.,

13   and yet in your amended complaint you still had claims

14   against them?

15         MR. HALL:  Yes.

16         THE COURT:  Why?

17         MR. HALL:  Well, I think that comes to the second

18   part of what Blue Water is complaining about, because they

19   are suggesting that this agreement that we had with P.A.D.I.

20   is somehow improper.

21         THE COURT:  How can it be proper to make it appear

22   that you're suing somebody, and I don't care for what, but

23   here it was just limited to negligence, and you're saying

24   that P.A.D.I. is negligent, and you have that in the pending

25   pleading, the pending complaint, yet you have just settled

1    and you have signed a settlement agreement with P.A.D.I. in

2    which you have accepted $800,000 in settlement money.  You

3    have acknowledged and you have released them from all

4    liability, and you have recognized their statement that they

5    have not accepted responsibility or acknowledged that they

6    are liable for anything under the law.  Just as a simple

7    matter of common sense, what could that claim possibly have

8    as a basis in law or fact or history or anything?  Why would

9    you still have a pending claim against them?

10          MR. HALL:  We have a pending claim -- first, as a

11   part of the negotiated settlement with P.A.D.I., that is the

12   way that they wanted to do it.

13          THE COURT:  Well, that makes it even worse.  It is

14   a fraud, it is a sham, it is not true.  You are not accusing

15   them of negligence because you have just settled the case

16   with them in which you say you didn't do anything wrong and

17   we're going to accept $800,000 and we're going to let you

18   stay in the case as long as the Court will let you to defend

19   your good name and good honor and whatever and to try to do

20   whatever the law allows you to do to keep the percentage

21   allocated to you and the fault on that special verdict form

22   as low as possible.  But why in connection with all of that

23   you still have the plaintiffs showing on a docket or

24   anywhere, where anyone in the public that wants to see what

25   is going on with this lawsuit will see, well, the plaintiffs

1    are still accusing P.A.D.I. of wrongdoing.

2              MR. HALL:  The reason that we did that was to

3    create a vehicle to allow P.A.D.I. to remain in the case and

4    defend themselves against the allegations of the Blue Water

5    defendants.

6              THE COURT:  I don't see how you can possibly

7    defend that.  That would be like me saying I want to keep my

8    credentials to get into this now very secure building by

9    pretending I'm still a judge if I wasn't.  You can't pretend

10   in a pleading on file with the Court that you're suing

11   somebody when you're not, can you?

12             MR. HALL:  Well, the very few Utah cases that we

13   were able to find on this issue and that are cited in our

14   brief allow these type of agreements.

15             THE COURT:  That kind of a sham claim?

16             MR. HALL:  Well, I don't know that the opinions

17   use the word sham claim, but in very analogous situations --

18   frankly, in agreements that go much further than what Your

19   Honor is describing in the so-called Mary Carter agreement.

20             THE COURT:  I am not getting to that.  I

21   understand that.  That is a whole different issue than

22   whether you can be asserting that you're suing somebody who

23   you have settled with completely.

24             MR. HALL:  Your Honor --

25             THE COURT:  It is just a simple concept and I just

1    don't see how you can defend it.

2           MR. HALL:  I am failing to see the distinction

3    between what we did with P.A.D.I. and the Mary Carter type

4    agreements that Utah courts allow.

5           THE COURT:  In those Mary Carter agreements they

6    are talking about the agreement between a settling defendant

7    and the plaintiff, not whether there was a pending illusion

8    going on in the court docket, that the plaintiff was still

9    suing a party that it was not suing anymore.  Usually when

10   you sue somebody and you settle with them, you dismiss the

11   case.

12          MR. HALL:  Well, Your Honor, as you know in the

13   case that is primarily cited in there, the Slusher case, I

14   believe that case gets down do the day before trial before

15   the party disclosed to the court that --

16          THE COURT:  Fair enough, but in that case did

17   there continue to be a pleading out there upon which people

18   were acting which indicated that the plaintiff was still

19   suing the party that they settled with?

20          MR. HALL:  Your Honor, I would think there would

21   have to be.  The matter was --

22          THE COURT:  If it was --

23          MR. HALL:  -- coming up for trial.  The same with

24   the Hoops case.  They were both cases that got all the way

25   to trial.  What the court said was that you have to disclose

1    to the Court that you have entered into this agreement prior

2    to trial.  Actually what they say, in fairness, is they talk

3    about prompt disclosure.

4            Now, they don't define, neither Slusher or Hoops

5    or any of these cases define prompt, but --

6            THE COURT:  Right, but that was disclosing the

7    settlement at all.  Here I guess the thing I'm concerned

8    about is people being misled and then acting to their

9    detriment, whether it is in time spent or strategies pursued

10   or procedures used, that is to their detriment both in terms

11   of time spent and money spent.

12           MR. HALL:  Well, I'll address that in two ways.

13   One, I don't think anybody was misled.  We mediated this

14   case for a full day and all of this was discussed, the

15   claims that the Blue Water defendants wanted to assert

16   against P.A.D.I. and --

17           THE COURT:  I was misled.  I thought you were

18   still suing P.A.D.I. for negligence.

19           MR. HALL:  Fair enough, Your Honor, but you didn't

20   file a motion against me for sanctions and talk about the

21   expense that you went through.  These defendants, as near as

22   I can tell, when I go look at the docket of what is filed in

23   this court and what was done and what work was done, none of

24   that was done prior to our disclosure of the settlement.  I

25   came into --

1          THE COURT:  I don't think anybody, the Court

2     included, and I remember the statement being made vaguely in

3     the hearing in my other courtroom, and I didn't ever get the

4     impression that it was a complete settlement.  That is what

5     this is all about, because then what you did after that,

6     after the March announcement, or whenever it was that we had

7     the hearing, you did state it, and then when you agreed to

8     dismiss all claims that were the subject of the motion to

9     dismiss, but to retain a couple of claims against P.A.D.I.,

10    that is the only thing that strikes me here as being

11    possibly improper.

12          I am not even sure why you did it still.  I asked

13    Mr. Concannon whether P.A.D.I. could remain in the case and

14    he thinks they can't once they have been completely

15    dismissed by you, the person who sued them, and if he does

16    not want to sue them, then they may just be an empty chair.

17    Apparently they, P.A.D.I., and you, the plaintiffs, it

18    appears wanted to structure something, and you say it in

19    your brief, so they could stay in and defend themselves, but

20    I am just not of the opinion that they can.

21          What were you trying to get away with?  That is

22    what they are asking.  What are you colluding to do here?

23    Maybe it is fair, but they think it is not.

24          MR. HALL:  We think that we followed the

25    requirements of the law and entered into an agreement that

1  is allowed that would allow P.A.D.I. to remain in this case

2  to defend themselves from the attacks that they knew were

3  coming by the Blue Water defendants.

4      THE COURT:  How were you planing to do that, by

5  keeping your claims, some of your claims against them alive?

6      MR. HALL:  Just like in a Mary Carter agreement

7  except for the fact that P.A.D.I. would have no financial

8  interest in how the litigation ultimately turned out.  They

9  would remain procedurally as a defendant, but --

10     THE COURT:  Because you're suing them.

11     MR. HALL:  Yes.

12     THE COURT:  Okay.  That is I guess what my

13  question was.  Do you think that you can do that?  I have

14  never ever heard of that being allowed.  We put a jury over

15  there and would they be told that you're suing P.A.D.I. for

16  negligence?

17     MR. HALL:  If you look at those few cases in Utah

18  that have considered it, they say that it is up to the Court

19  to determine how much of the settlement agreement between

20  the remaining defendants is --

21     THE COURT:  That is not really answering my

22  question.  I guess I'm still back to can we seat a jury and

23  tell the jury that this lawsuit is against the plaintiffs

24  and for what it is for, and they are suing Blue Water Scuba

25  alleging this and they are suing P.A.D.I. alleging

1    negligence when you have settled the case with P.A.D.I.?   I

2    don't think so.   That would surprise me.   Sooner or later

3    you're going to have to disclose that to the Court and to

4    the other parties so that they can develop their strategy

5    and their rights accordingly.

6          MR. HALL:   Well, obviously the cases do say that

7    we have to disclose it, and getting back to that, they say

8    prompt disclosure, and the Court then goes on to talk about

9    misleading the jury and factors such as that.   In the few

10   cases that have defined what prompt disclosure is, it means

11   prior to trial.   Your Honor, in this case we made this

12   disclosure prior to the answer, prior to the third-party

13   claims, prior to discovery, and prior to entry of the

14   scheduling order.

15         THE COURT:   We are like two ships passing in the

16   night, you and me.   You come back with these answers that

17   really are not reaching my problem.   Separate and apart from

18   whatever any case has said, it is a pretty simple notion

19   that if you have done something that has caused your

20   opponent to be in the dark about an important factor that

21   will cause them to do work that they didn't need to do, to

22   do unnecessary work, then I think it is an improper thing

23   for a party to do.   That is all I'm saying.   They should be

24   compensated for this needless chasing around of claims and

25   cross-claims that they would not have done if they had known

1    the truth.

2          MR. HALL:  Your Honor --

3          THE COURT:  You seem puzzled.

4          MR. HALL:  -- they didn't make those claims until

5    we had already disclosed it.  How can they say they had to

6    do all these things because of something we kept secret that

7    was not secret at the time they did it?

8          THE COURT:  Well, I'm not here to answer

9    questions, but I will answer that.

10          MR. HALL:  I meant it rhetorically.

11          THE COURT:  I will answer it.  It is because you

12   didn't fully disclose it.  You want to make a lot of the

13   fact that you stood up and said we have reached a settlement

14   with P.A.D.I.  Then after that you did things that showed

15   clearly and plainly that not all of the claims had been

16   settled by your own actions, by wanting an amended complaint

17   to still preserve claims by your clients against P.A.D.I.

18   That misled the Court.  It misled Mr. Concannon's clients of

19   the actual nature of things.

20          To your benefit they have not done too much in

21   reliance on it, partly because you announced there had been

22   a partial settlement and you wanted this protective order

23   and that got fought over and then they finally found out

24   mwait a second, they settled everything for $800,000.  That

25   is a long answer, but you asked the question.  That is why,

1   because they didn't know the whole thing had been settled.

2   They thought there were still claims by the plaintiffs

3   against P.A.D.I.  Apparently it looks like there was some

4   effort, and I can hear from P.A.D.I.'s attorneys probably

5   next, but some effort to try to keep P.A.D.I. involved in

6   the lawsuit, but under the procedures and the law that they

7   are no longer a party in.

8          MR. HALL:  I think that is absolutely right, Your

9   Honor.  I think that P.A.D.I. wanted to stay in the case.

10   They came to us and said we're willing to enter a

11   settlement, and that is one of the things they wanted was

12   this vehicle to be able to remain in the case.

13          THE COURT:  But you can't improperly remain in the

14   case.  You can't do it through some subterfuge.

15          MR. HALL:  Respectfully, our position was based on

16   the case law that we read about those types of agreements

17   and that what we did was proper.  Now, obviously if the

18   Court disagrees, it disagrees, but I will say this, Your

19   Honor, that the request for sanctions -- when you look at

20   the cases in which sanctions are imposed, those are

21   egregious cases.

22          In this case I'm not even sure that there is any

23   clear violation of anything.  As I stand here today, I

24   believe that our actions were proper as allowed under the

25   case law here.  Now, if I am wrong, I'm wrong, but certainly

1    we were operating under what we believed to be in the best

2    interest of our respective clients and within the

3    jurisprudence of Utah.  There is certainly no basis to

4    suggest that we acted with the clear showing of bad faith

5    required for sanctions.  There is no effort and no evidence

6    of a serious or standard disregard for the ordinary process

7    of justice.  The Tenth Circuit has emphasized a strictly

8    construed and extreme standard to use their language, and I

9    just don't see how that existed in this matter.  I certainly

10   can understand the Court's concerns, but --

11          THE COURT:  Well, people often want to keep in a

12   status that is helpful to them, and I can understand that,

13   and I sentenced a guy not too long ago for continuing to

14   collect his dead father's Social Security checks.  He was

15   not about to let the Social Security Administration know

16   that his father had died.

17          Status is important here, I assume, and I don't

18   know, but it appears that what you and your clients and the

19   deal you struck with P.A.D.I. was trying to do was to keep

20   P.A.D.I. in the case through the illusion of a claim that

21   couldn't possibly have any legal merit because it had been

22   paid for and dismissed.  It is as simple at that.

23          I don't know how egregious and bad and awful it

24   is.  It was certainly found out about early in the process,

25   but the simple matter of misrepresenting that a claim is

1   valid in a court proceeding I think is fairly serious.   I

2   may be missing something, but I don't see how you could even

3   think that that could possibly be proper.

4            MR. HALL:  Because --

5            THE COURT:  We are warranting to the Court that we

6   have claims against P.A.D.I. and we don't.  That seems to me

7   to be improper.

8            MR. HALL:  I don't think it is a matter of us

9   asserting that we have claims against P.A.D.I.  I think it

10  is when do we disclose that we have reached a settlement

11  with P.A.D.I.

12           THE COURT:  After you have reached a settlement

13  you filed an amended complaint in which you asserted that

14  you had claims against P.A.D.I.

15           Did anybody say can we do this?

16           MR. HALL:  Yes.

17           THE COURT:  We don't have claims against P.A.D.I.

18           MR. HALL:  Yes.

19           THE COURT:  We have gotten a check from them and

20  we have released them.  We don't blame them for anything

21  anymore.

22           MR. HALL:  Yes, that question was asked and that

23  is why we went and looked at the Utah cases to see if these

24  type of Mary Carter like agreements were allowed.  We were

25  of the opinion that they were allowed.

1          THE COURT:  Again, it is like comparing apples to

2    oranges.  The Mary Carter business is different.  That is

3    where you are leaving some incentive for P.A.D.I. to reduce

4    their obligation to you by jacking up the percentage of some

5    other co-defendant.  That is the Mary Carter deal.  That

6    says nothing about whether it is okay for a plaintiff to

7    proceed with an amended complaint that has, post settlement

8    with a client, that has pending claims that you know are

9    bogus.

10         MR. HALL:  I would make it analogous to, for

11   example, the Hoops vs. Watermelon case, which are the two

12   names I remember, and that was not a Mary Carter agreement.

13   That was an agreement that was disclosed apparently the

14   morning of trial or the day before, and the court said that

15   there was no prejudice and there was nothing wrong with it

16   simple because it was disclosed prior to trial and was

17   subject to cross-examination.  The jury was able to be

18   informed of it.

19         When we looked at this situation, we analogized it

20   to that.  In fairness, being uncomfortable with just the

21   fact that those claims existed, that is precisely why I did

22   disclose it in open court that we had reached a settlement,

23   because there was a question about these claims against

24   P.A.D.I.

25         I will tell the Court now, and you have seen it in

1    the pleadings, but we have also entered a settlement with

2    the Boy Scouts.  The Boy Scouts also apparently want to

3    remain somehow in the case to be able to protect themselves.

4    Maybe we see these same exact issues coming down the road

5    with those guys.  Maybe the distinction is that I have not

6    filed anything since entering that settlement and disclosing

7    it, but it has been disclosed to them.

8             THE COURT:  Now, on the issue of revising the

9    protective order, what is your position on that?

10            MR. HALL:  You know, Your Honor, I suspect that

11   that is what this is all about.  I think that this entire

12   motion is a pretextual attempt to back out of the protective

13   order that the Blue Water defendants agreed to.  My position

14   is that protective orders regarding settlement agreements

15   are supported by the case law as they tend to encourage

16   settlement.  I suspect that the settlement may not have

17   occurred without a protective agreement.  I also suspect

18   that if the Blue Water defendants ever settle this case,

19   that they are going to want some type of protective

20   agreement or confidentiality agreement themselves.

21             That said, Your Honor, the plaintiffs really don't

22   have a dog in that hunt.  That is something that P.A.D.I.

23   wanted and we promised not to stand in their way and to

24   support them.  The language of it does not matter.  I think

25   it is much more important to P.A.D.I. because of all of

 1   these other cases that P.A.D.I. and that these same

 2   insurance companies have going on against each other.  This

 3   is not about what happened here.  This is about these other

 4   cases and this other litigation.

 5            THE COURT:  Thank you very much.

 6            MR. HALL:  Thank you, Your Honor.

 7            THE COURT:  Was someone from P.A.D.I. going to

 8   address the Court?  Mr. Bullock?

 9            MR. BULLOCK:  Yes.

10            THE COURT:  Yes, please.

11            MR. BULLOCK:  The overriding concern and the

12   concern from P.A.D.I.'s point of view is that it wouldn't be

13   fair, that it won't be fair for Blue Water to point the

14   finger of blame at P.A.D.I. and P.A.D.I. not having any

15   opportunity to defend its diving course.  Blue Water has

16   made it clear that that is their agenda.  They will

17   acknowledge that, I believe, that they want to put P.A.D.I.

18   on trial and try the P.A.D.I. diving course.  Then they want

19   to use that however they may in other cases and in

20   publications and to the public and anything that will gain

21   an advantage in other pending and future litigation.

22            Perhaps it would be helpful to the Court to look

23   at Blue Water's cross-claim against P.A.D.I. for allocation

24   of fault.  It goes into specifics and it enumerates --

25            THE COURT:  Did you say trust claim?

1          MR. BULLOCK:  Cross-claim.

2          THE COURT:  All right.

3          MR. BULLOCK:  They filed a cross-claim just for

4     allocation of fault.  P.A.D.I. has answered it.  I suggest

5     that may be the mechanism where P.A.D.I. can legitimately

6     defend itself and represent its valid interests.  We don't

7     have a lot of case authority on what a defendant to a

8     cross-claim for apportionment of fault can do in the

9     litigation, but it stands to reason that if they have been

10    sued and joined in the litigation for that purpose, if it is

11    that important to Blue Water, then Blue Water shouldn't have

12    the luxury of pointing the finger of blame to an empty

13    chair.

14          Judge Campbell, Tena Campbell came up against this

15    in Corporation of Presiding Bishop versus Queen Carpet in

16    1998, and she wrote the Utah Liability Reform Act creates a

17    cause of action under state law.  The Act provides for the

18    joinder of any person who may have caused or contributed to

19    the injury or damage for which recovery is sought for the

20    purpose of having determined their respective proportion of

21    fault.  We submit that when you're sued on a cause of action

22    and your name is on the pleading and the cross-claim is in

23    place, that you're entitled to participate in the case and

24    represent your interest in that regard.

25          THE COURT:  I take it that is why you want it to

1   appear that the plaintiff still had a claim against you as a

2   defendant, against your client as a defendant, because then

3   a cross-claim would be proper as against you from Blue

4   Water?

5          MR. BULLOCK:  Apparently the remaining in or

6   appearing to remain in was an awkward and ill advised

7   tactic, but I want the Court to understand the motive and

8   that the reason is sound and speaks strongly of justice.

9          THE COURT:  Well, it may, and that is why earlier

10  I asked Mr. Concannon -- and I don't know the answer to that

11  question, I don't as I sit here -- the question about

12  whether a party against whom arguments are being made in

13  trial, in a case like this who has settled out, has any

14  right to defend itself, has any ability during that trial

15  process, if they have chosen to settle with the plaintiff,

16  whether they have any ability and whether it is just or

17  unjust under the procedures and under the acts in question

18  to even be here.

19          I suspect, and I am not ruling on this, but I

20  suspect the answer is you don't.  This business has always

21  been a head scratching part of the law, and that is why we

22  keep getting changes from the legislature, and from the old

23  comparative negligence acts until now and we sometimes say,

24  well, what do we do with an empty chair?  It causes a lot of

25  parties to think through a lot of issues, especially

1    regarding settlement.

2          Well, if we settle, and if your client, P.A.D.I.,

3    says we're going to maybe end up looking really bad if the

4    plaintiffs are no longer pointing the finger at us but Blue

5    Water is, and if we are not allowed to be there to defend

6    ourselves we might get a higher percentage on that form, and

7    it is not going to cost us any money, but it is going to

8    make us look bad if it is used against us in the public

9    relations world or wherever else it hurts us.

10          Right?

11          MR. BULLOCK:  Well, that is true.

12          THE COURT:  Okay.  So I can see that being an

13    issue, but having a masquerade that the plaintiffs are still

14    suing you when they were not is obviously the thing that

15    troubled me with Mr. Hall and it still does.

16          In your briefing, which was extensive, it was

17    remarkable to me, and it is in the opposition that Mr. Hall

18    filed and that you filed, and Mr. Hall's was even lengthier,

19    it was robust and it was strongly worded and it was talking

20    about half lies and half truths and the shenanigans being

21    used by the Blue Water defendants and so on, but they never

22    addressed ever in either of those lengthy briefs did it

23    address this little issue about why after the settlement did

24    the plaintiff represent to everybody that they were still

25    suing your client.

1              Can you defend that?

2              MR. BULLOCK:  I tried to explain the motive behind

3    it.

4              THE COURT:  I understand the motive.  I probably

5    completely understand it, and I don't know where it shakes

6    out, but I understand it.

7              MR. BULLOCK:  The procedure I think was born of

8    necessity and it seemed acceptable based on the facts of

9    other similar cases and other similar settlements.  We

10   looked to Slusher and we looked at how little had been done

11   at the time these things happened in the course of the case.

12             Now, no mistake, Blue Water had the written

13   settlement agreement in its hands by August of last year.

14   The scheduling order was not even entered until December.

15   Any harm was contained to that period of time.  By August

16   Blue Water knew that it was an entire total settlement, a

17   complete settlement, and it seems to me that a less

18   explosive reaction might have been to say, hum, it looks

19   like they settled the whole thing.  I am going to file a

20   motion to dismiss with prejudice that remaining stuff that

21   they have got against P.A.D.I.  That will take care of that.

22             THE COURT:  Well, to be fair, that is in their

23   motion, this motion.

24             MR. BULLOCK:  Fine, but I don't think -- fine.

25   Thank you, Your Honor, and I acknowledge that.

1          THE COURT:  It is only part of it, and you say you

2     wouldn't have gone the next step and sought sanctions.

3          MR. BULLOCK:  I don't think that is indicated

4     because of the time line.  The complaint was filed in June

5     of 2012, and P.A.D.I. participated voluntarily in the

6     mediation two months later, three months later and, as these

7     things happened, continued to work toward a settlement after

8     the mediation and by March that had happened.  We thought we

9     were the good guys.  We thought settlements were favored and

10    that it is a good thing to do and it moves things in the

11    direction of the speedy and efficient administration of

12    justice.  We got the settlement agreement and then notified

13    the Court and counsel in May of 2013.

14          Finally, after some back-and-forth that wasn't --

15    well, you know, the terms of the protective order were

16    agreed to by August, and then everything was on the table

17    and everything was known.  If there is some mitigation to

18    this, that is it, that we did not send knowingly.

19          I do want to return to the cross-claim and the

20    import of the cross-claim.  I submit that the --

21          THE COURT:  Don't you have to acknowledge it is

22    gone now?

23          MR. BULLOCK:  No.  I don't see that they are

24    related.  That may be my problem.  I don't see relationships

25    sometimes where brighter people do, so I am open here, but

```
 1    the thing is --

 2           THE COURT:  I don't know how you can have a

 3    cross-claim against a party that is not a party, that isn't

 4    a defendant.

 5           MR. BULLOCK:  Well, they are still a defendant

 6    with respect to the cross-claim.  All of these third-party

 7    defendants --

 8           THE COURT:  I don't think that is before me today.

 9           MR. BULLOCK:  All of these third-party defendants

10    are --

11           THE COURT:  It is in a way.

12           MR. BULLOCK:  Pardon me.

13           THE COURT:  It is in a way.  In a way it is.  That

14    would affect me somewhat.  If their cross-claim is allowed

15    to remain against you, and I assume they are not going to

16    continue to assert a cross-claim, based on what Mr.

17    Concannon said earlier, correct?

18           MR. CONCANNON:  Your Honor, what we would like is

19    we would like the amended complaint stricken, and the

20    cross-claim is in an answer to an amended complaint, and we

21    would like an opportunity to file a new responsive pleading.

22    It is likely that we will not assert cross-claims.

23           THE COURT:  That is what I understood him to say,

24    that if they had known the truth about the people being sued

25    by the plaintiffs, then their position all along is that
```

1    they wouldn't have filed the answer and cross-claim that

2    they filed.

3            MR. BULLOCK:  Well, the cross-claim was for

4    apportionment of fault.

5            THE COURT:  Right.  This really does come down to

6    what you talked about earlier, that you're going to have an

7    opportunity to defend yourself in the trial or not?

8            MR. BULLOCK:  Basically what Blue Water is saying

9    is that they are contemplating dismissing the cross-claim --

10           THE COURT:  Not --

11           MR. BULLOCK:  -- but by no means will they abandon

12    their agenda of putting P.A.D.I. on trial.

13           THE COURT:  Right.

14           MR. BULLOCK:  They want to do it without P.A.D.I.

15    being there to fight back because it is easier.

16           THE COURT:  Right, pursuant to the rules.  I don't

17    think they want to dismiss their cross-claim.  They don't

18    want to ever assert it.

19           MR. BULLOCK:  It has been asserted, though, and I

20    think that the Court should allow it to remain in place.

21    This is a rare instance.  Usually people can't wait to get

22    out of cases.  Third-party defendants rarely say, no, I want

23    to stay in and I demand my chance to vindicate myself.  In a

24    case where there is recurring and a history and a

25    prospective future of recurring litigation over the same

1    issue, I can imagine the same scenario coming up in

2    automobile litigation or pharmaceuticals or tire litigation

3    or --

4              THE COURT:  Any time there is an allocation of

5    fault.

6              MR. BULLOCK:  And where there is an entity which

7    can face other claims.  We have seen how this gets used.  In

8    Blue Water's motion and memorandum they have included a

9    footnote on page 8 where they went into detail about what a

10   judge in the Hawaii Isham case had to say about P.A.D.I., so

11   now we'll have what happened in Utah against P.A.D.I. is

12   going to be spread far and wide and improperly and in the

13   same way.  They are not going to include a disclaimer of, by

14   the way, P.A.D.I. was not there to tell its side of things

15   and to defend itself.  That is not right.  That is not fair.

16             THE COURT:  Now you feel like a judge.

17             MR. BULLOCK:  I wouldn't presume that.

18             THE COURT:  No, I mean in the sense that judges

19   don't respond to anything in the press.  You just take it,

20   no matter how unfair it may seem.

21             I don't write these rules of procedure nor the

22   laws about allocation of fault.  I have told you as I sit

23   here I don't know exactly what your rights are to defend

24   yourself.  I know one of them that does not strike me as

25   appropriate, and that is to allow a misleading pleading to

1   not just remain on the books, and remaining on the books I

2   think may happen in some of these cases where settlement

3   didn't get revealed until the eve of trial or something, but

4   this is not remaining on the books.  This is a change.  This

5   is an amended complaint after a settlement is reached.  I

6   don't think that strikes me as being proper.

7          That is a different debate than what the rules of

8   procedure allow a party or an entity, against whom fault is

9   being offered, that entity's right to defend itself when it

10  has become a nonparty in the case.  I will be glad to

11  entertain motions or requests about that, to the extent that

12  anyone wants to bring them, including your client to see

13  what rights you have for justice at a trial, but the method

14  that was utilized here strikes me as being a little bit

15  improper.  I think you're right, the damage does not appear

16  to be too much yet.

17         MR. BULLOCK:  We anticipate our position on the

18  cross-claim to be that it is in place and it was filed and

19  we have answered it, and so we are part of this case for the

20  claims in the cross-claim and for the defenses and our

21  answer to the cross-claim.  Where that goes, as Your Honor

22  pointed out, it is going to have to abide further

23  proceedings.

24         The protective order removal does not make sense.

25  The request by Blue Water does not seem to be appropriate to

1    the complaint that they have.  They stipulated to the

2    protective order.  It is a reasonable protective order.  It

3    gives them full latitude.  It even gives their insurance

4    carrier full latitude in the litigation on the coverage

5    issues, which is a totally different lawsuit.

6            What it does not do is open the door to wholesale

7    and improper use and publication.

8            THE COURT:  Thank you very much, Mr. Bullock.

9            MR. HALL:  Your Honor, can I make one very brief

10   point?

11           THE COURT:  Mr. Hall, go ahead.

12           MR. HALL:  I will be very brief.

13           I understand the Court's concern over the amended

14   complaint that we filed.  I simply want to point out that

15   the only reason that that amended complaint was filed is

16   because there was a motion to dismiss like five of seven

17   claims pending before this Court, and we didn't want the

18   Court to rule on that motion to dismiss since we had reached

19   the settlement.  That is the only reason that was filed.

20           So when you're looking into our behavior and why

21   we did what we did, I want to make sure that the Court

22   understands that that was simply to prevent the Court from

23   rendering an opinion on an issue that was moot by the

24   settlement.

25           Thank you.

1          THE COURT:  Thank you.

2          MR. CONCANNON:  May I briefly address the Court?

3          THE COURT:  Go ahead.

4          MR. CONCANNON:  Thank you.

5          I want to address something that Mr. Bullock

6    raised that is new and different from the briefing, the

7    question of motive.  He said something along the lines that

8    the Blue Water defendants have made statements in other

9    cases to the public and in publications.  He must be

10   referring to himself and his own client because that is

11   absolutely false.

12         What has happened is that 13 days after this

13   incident took place, P.A.D.I. expelled Corbett Douglas as a

14   member of P.A.D.I. publicly.  It is listed in their Web

15   site.  The reason that they gave was that they had

16   determined that Mr. Douglas's membership was no longer in

17   the best interest of P.A.D.I.  Mr. Douglas wrote a letter

18   and asked P.A.D.I. to explain what basis they had for

19   expelling him and what standards did he violate and P.A.D.I.

20   never responded.

21         What P.A.D.I. did do at a public forum, at the

22   largest diving trade show in the world, was stand up and

23   make an issue of Mr. Douglas in front of a large audience of

24   instructors and members of the diving industry profession.

25   Mr. Douglas is the father of four children and he is an Iraq

```
 1   war veteran and school teacher and professional scuba
 2   instructor.  I, for the life of me, have never been able to
 3   identify a single training standard that he violated.
 4   P.A.D.I. has never identified a single training standard
 5   that he violated.
 6          Within the confines of this case Mr. Douglas has
 7   defended himself.  Within the confines of this case
 8   Mr. Douglas has pointed out deficiencies in P.A.D.I.'s
 9   Discover Scuba Diving program and he has alerted the court,
10   and others, and a federal judge in particular has pointed to
11   the same deficiencies.  He is simply defending himself.
12          He has not settled the case.  He is going to
13   defend these allegations but not settling the case.
14   P.A.D.I. had the same opportunity to defend itself by not
15   settling the case.  P.A.D.I. is as complicit, and you heard
16   Mr. Hall acknowledge that P.A.D.I. requested that it stay in
17   this case.
18          The Court asked about modifying the protective
19   order, and P.A.D.I.'s real issue is that they don't want the
20   world to know what they have done here, but the Blue Water
21   defendants have not published that in any way.  If that
22   settlement agreement becomes part of the public record, that
23   is P.A.D.I.'s problem and maybe they shouldn't have done
24   what they did.  We have a case of monkey see, monkey do
25   here, because, as Mr. Hall acknowledged, the Boy Scouts have
```

1    a similar provision in their settlement agreement entered

2    six months ago which says that we can stay a party to this

3    case as long as we want, and then we'll let you know when

4    you should dismiss us.  I have not heard a single federal

5    case cited, not a single federal rule, and we keep talking

6    about the Utah Supreme Court and Slusher, but whatever the

7    Utah Supreme Court wants to do with its procedural rules is

8    interesting, but it is irrelevant in an Article Three Court.

9            When it comes to motive, I take offense and my

10   client takes offense to being accused of doing anything that

11   is not in P.A.D.I.'s interest, and I submit that if they

12   wanted to stay in this case and defend themselves, they

13   could have done that.

14           I don't lightly violate the secrecy of a mediation

15   process, but I can tell the Court that when we mediated this

16   dispute in Las Vegas, the parties sat in three separate

17   conference rooms.  They did not make statements to the

18   mediator.  They did not make statements to each other,

19   except for me going over to the Tuvells and expressing my

20   condolences for their loss, because David Tuvell was the

21   same age as my daughter Megan.  That is it.

22           What we were told was P.A.D.I. thinks you're

23   responsible.  We were not told why.  We were told P.A.D.I.

24   says that you are responsible and you should pay.  Whatever

25   they say, and the Court is well aware of the time line here,

1    the settlement in March, the partial statement in May, the

2    full disclosure at the end of August, and whatever

3    P.A.D.I.'s motives were, I would submit that they are not

4    exactly being candid with this Court.

5         THE COURT:  Other than for the convenience of

6    filing pleadings, why do you want the protective order made

7    public?

8         MR. CONCANNON:  We don't think that there is

9    any -- well, aside from the administrative really headache

10   that it creates with the remaining defendants with regard to

11   that, which is a burden, and it is a burden on the Court and

12   it is a burden on us, but we don't think that there is any

13   purpose to protect the secrecy of the collusion clause or of

14   what P.A.D.I. did or even what the B.S.A. did, which that is

15   now a matter of public record, in maintaining their position

16   in this case.  There is no public policy that favors

17   maintaining the secrecy of that.  In fact, the public policy

18   is the opposite.

19        THE COURT:  Right, but if that effort is defeated,

20   what is the reason for publicizing it or making it

21   available?

22        MR. CONCANNON:  Well, first of all, it is simply

23   going to be a matter of public record on Pacer.  We are not

24   going to issue a press release or distribute it or do

25   anything like that.  We do intend to make an issue of

1   P.A.D.I.'s statement that they feel that the Blue Water

2   defendants are solely responsible for David Tuvell's death.

3   That is a hotly contested issue.  That is going to be a

4   subject in this litigation.  We don't believe that that

5   statement, and I don't know what basis they have for that,

6   and we are going to explore that, but I don't know what

7   basis they have to point the finger at a man that still has

8   not been told what he did wrong.  That shouldn't be kept

9   secret from the public.

10          THE COURT:  I don't know why the public -- it

11  would seem like you may not want it kept secret from a jury,

12  somebody deciding the case, but --

13          MR. CONCANNON:  One of the issues now is going to

14  be the safety of the Discover Scuba Diving program.  That is

15  an issue that has been in the public domain for quite some

16  time.  We contend that it is not that Corbett Douglas

17  violated any standards.  It is that the standards, if there

18  is an issue over how David Tuvell died, the program does not

19  allow you -- for instance, it does not tell you how to make

20  a safe ascent.  It does not tell you how to stay on the

21  surface.  It does not tell you to drop your weights and

22  maintain your buoyancy.  None of this information is given

23  to the participants.  The instructors are not allowed to

24  deviate from that.

25          If those are in fact problems with the D.S.D.

1  program, we think that that is something that should be

2  explored in the litigation.  We don't think that the Court

3  should protect the secrecy of P.A.D.I.'s statements and

4  P.A.D.I.'s conduct.  If you want to promote settlements,

5  legitimate settlements, then, fine, let's take the money out

6  of it.  Let's take the $800,000 payment out of it.  Let's

7  protect that, but there is no legitimate basis, and, in

8  fact, we already have another defendant following the lead

9  of P.A.D.I., and there is no legitimate basis to protect

10  those other provisions.

11           That is our position.

12           THE COURT:  Let me make --

13           MR. SKOLNICK:  Before the Court rules, may I be

14  heard on behalf of Boy Scouts of America?

15           THE COURT:  I am not ruling yet.  I'll hear you in

16  just a second.  Let me finish my question.

17           Let me make it clear what it is that you're

18  seeking.  You want the protective order to be modified or

19  amended, revised?

20           MR. CONCANNON:  That is correct.

21           THE COURT:  Tell me exactly how you describe what

22  you want with regard to the pleadings.

23           MR. CONCANNON:  Exactly what we want is we want

24  the amended complaint stricken, and then we would like a

25  reasonable period of time to file a responsive pleading to

1    the complaint.

2              THE COURT:  To the what?

3              MR. CONCANNON:  The complaint.

4              THE COURT:  Was there just one appended complaint?

5              MR. CONCANNON:  Yes, sir.

6         If at some point the plaintiffs would like to

7    amend their pleadings, they can come and seek leave and

8    provide whatever their basis is and we can respond to that,

9    but that is in the future.  We would like to restore this

10   case to the procedural posture it was in on March 11, 2013.

11             THE COURT:  Which would eliminate your answer

12   and --

13             MR. CONCANNON:  That is correct.

14             THE COURT:  -- cross-claim?

15             MR. CONCANNON:  That is correct, and third-party

16   complaint which is now dismissed, yes.

17             THE COURT:  Okay.  Thank you.

18             Yes, come on forward.  I hope I have this right.

19   It is Mr. Skolnick?

20             MR. SKOLNICK:  I am, Your Honor.

21             THE COURT:  Good.  Thank you.

22             MR. SKOLNICK:  Michael Skolnick, Kipp & Christian,

23   for Boy Scouts of America and Great Salt Lake Council and

24   Michael Perry.  The Court may recall that Michael Perry was

25   the scoutmaster that was involved in this accident, this

1    tragedy.

2         Your Honor, as I was going along and listening to

3    counsel for plaintiffs and counsel for the Blue Water

4    defendants, and I see both sides of this and in listening to

5    the Court and I understand the Court's concerns, and the

6    only thing I take exception to and that I want to point out

7    to the Court is the extent that Mr. Concannon is suggesting

8    that the Boy Scouts of America and that group of defendants

9    are in the same boat.  It is a very different situation.  I

10   wanted to make a record of why I believe that to be the

11   case.

12        I would also say that Mr. Concannon and I have had

13   a very good professional discussion about, for instance, the

14   protective order motion that we filed and in trying to come

15   to terms on specific elements of a protective order that

16   they could agree to and that we could agree to.  The Court

17   entered their form of protective order and we're fine with

18   the form of protective order that stands.  It protects the

19   amount of the settlement and the other terms that are out

20   there.  The thing I take exception with is the suggestion

21   that we are somehow following the pattern of what was done,

22   and that --

23        THE COURT:  But there is no motion here today with

24   respect to you.

25        MR. SKOLNICK:  There is not, Your Honor, but it is

1    a related issue and I wanted to bring our position to the

2    Court's attention, if I may briefly.

3              THE COURT:  You may, but you are only jeopardizing

4    your client.  I'm not going to do anything or had not

5    planned to do anything with the Boy Scouts clients today.

6              MR. SKOLNICK:  I had not understood that the Court

7    would, but to the extent that --

8              THE COURT:  Then why would you want to?

9              Go ahead.

10             MR. SKOLNICK:  I guess the reason that I wanted

11   to, Your Honor, and when the Court invites you to shut up

12   maybe it is a good idea to do so, but --

13             THE COURT:  Like that medical thing, first do no

14   harm.

15             MR. SKOLNICK:  Or when you're in a hole, stop

16   digging.

17             THE COURT:  I don't think you are in a hole yet.

18             MR. SKOLNICK:  And I don't want to get myself in

19   one, Your Honor.  I just think we are in a different

20   position.  We have an affirmative claim that this Court

21   supported and denied a motion to dismiss about, so we have

22   an affirmative claim to bring on behalf of the Great Salt

23   Lake Council against I think several of the Blue Water

24   defendants.  I forget exactly who.  It is a claim for breach

25   of contract about not getting insurance.

1              That keeps us in the case at a minimum, and we may

2    need to dismiss the claims against us by the plaintiffs and

3    then bring a complaint in intervention to be able to assert

4    that claim in this case, and I guess that is a procedural

5    approach that we could take, but that is an important

6    difference.  The settlement terms are quite different as

7    well.  I just wanted to bring that to the Court's attention.

8              THE COURT:  Thank you, Mr. Skolnick.

9              The motion of the Blue Water defendants is granted

10   as follows:  First, I'm striking the protective order for

11   good cause.  Under the circumstances I am finding it is

12   improper for P.A.D.I. and the plaintiffs to do what they did

13   with respect to misrepresenting, after a full settlement had

14   been reached, misrepresenting that a case was still alive.

15   It is as simple as that.  I think that is improper behavior,

16   and I do think the parties acted under these unique

17   circumstances, they acted based on a belief that P.A.D.I.

18   was still a defendant.

19             As to the protective order, I am going to require

20   the amount to remain confidential, otherwise the protective

21   order is stricken and revised in that manner.  Because I

22   find that the Blue Water defendants acted to their detriment

23   with the misrepresentation that claims were alive that

24   weren't, I am going to order that the amended complaint be

25   stricken and that the answer and the cross-claims that were

1    in response to the amended complaint also be stricken.

2              As for the motion for sanctions, my understanding

3    is that aside from the time and expense associated with this

4    very motion, there hasn't been very much.  I'm going to

5    award a $2,000 sanction, which I think will recognize

6    primarily that the defendants, the Blue Water defendants

7    unnecessarily responded to the amended complaint.  That will

8    be awarded against both P.A.D.I.'s counsel and the

9    plaintiffs' counsel jointly and severally.

10             That is my very rough estimate and that is below

11   any computation of any reasonable attorney fee for that

12   relatively meager work.  I'm not awarding attorneys' fees

13   for this motion.  I am going that low because I think that

14   no one could reasonably argue that that is too high of an

15   amount for the work attributed to it.  If there is an

16   objection to that by the plaintiffs' counsel or P.A.D.I.'s

17   counsel, I will entertain a motion for a more specific

18   account of attorneys' fees that were incurred by Blue Water,

19   but I think that would probably just cause more work, more

20   unnecessary work.  That is the way I see this.

21             I don't see this case as being particularly like

22   any case that was shown to me.  Whether P.A.D.I. can have a

23   chair that it can occupy during the trial to defend itself,

24   I don't know.  I am not ruling on that.  I know that the

25   vehicle of remaining a cross-claim defendant is not a

1    possible vehicle.  It is up to, of course, the defendants to

2    decide whether to file a third-party complaint.  I'm saying

3    nothing at all about the other defendants, the Boy Scout

4    defendants or anyone else.

5          Yes, sir.

6          MR. DAVENPORT:  As I understand the basis of your

7    ruling, you mentioned the cross-claim but that would also

8    extinguish the third-party complaint.  We were just brought

9    in on comparison of fault, and I represent a 12-year-old,

10   and it was solely on comparison of fault in the third-party

11   complaint.  As I understand your ruling, that third-party

12   complaint has now been extinguished.

13         THE COURT:  I hadn't thought about that.  What do

14   you want me to do on that one?  That is unrelated to what we

15   have been discussing.

16         MR. CONCANNON:  Yes.

17         MR. DAVENPORT:  If you take the pleadings all the

18   way back there, then that pleading is gone.

19         MR. CONCANNON:  That is right.  The only question

20   I have is -- he is right that the third-party complaint

21   would be stricken as well.

22         THE COURT:  Earlier you just said it was these

23   Nevadans and --

24         MR. CONCANNON:  Well, there are five Nevada

25   defendants, third-party defendants.

```
1              THE COURT:  What do you want to do with these?

2              MR. CONCANNON:  What I would like to do --

3              THE COURT:  Wouldn't it just be up to you to

4    refile that third-party complaint and --

5              MR. CONCANNON:  It would be.

6              THE COURT:  Okay.

7              MR. CONCANNON:  I would like a reasonable period

8    of time for Mr. Waldbillig and I to answer the complaint.  I

9    don't know what that is, 10 or 20 days, whatever the Court

10   desires.  We could think about it and talk about it and --

11             THE COURT:  Let's make it easy.  20 days from now

12   you respond to the complaint, unless they want to file an

13   amended complaint, and let's not do it twice, but I don't

14   know that they do based on what I have done here.

15             Mr. Skolnick?

16             MR. SKOLNICK:  Thank you, Your Honor.

17             Mr. Perry, Michael Perry that I mentioned, the

18   scoutmaster, he is also a third-party defendant.  I assume

19   that he would be included in that.

20             THE COURT:  Yes.  20 days to file your responsive

21   pleadings.

22             MR. CONCANNON:  Thank you.

23             THE COURT:  Yes.

24             MS. ROSENTHAL:  Your Honor --

25             THE COURT:  You're out.
```

1          MS. ROSENTHAL:  We are out, and he is not able to

2    refile in this form again, correct?

3          THE COURT:  Unless he comes up with different

4    facts.  I don't think I did that with prejudice, and that

5    would all be based on whether he finds something -- I am not

6    allowing him to do discovery on it and to keep you in while

7    he does discovery.  It seems like a long shot to me, but I

8    am not saying with prejudice.

9          MR. CONCANNON:  Just to be very, very clear, we

10   would like the procedural posture set so that we can

11   consider all of these issues.  My understanding is that they

12   asked for a dismissal based on lack of jurisdiction, and

13   that is not with prejudice, and we'll look at allocation of

14   fault, but my understanding is we can look at that with or

15   without jurisdiction, but I will talk to Mr. Waldbillig

16   about that.

17         MR. SKOLNICK:  Your Honor, does the 20 days run

18   from today?

19         THE COURT:  Yes, from today.

20         Yes, sir.

21         MR. HALL:  Your Honor, if I understand the Court,

22   the plaintiffs don't need to refile anything.

23         THE COURT:  No.

24         MR. HALL:  These parties need to go back and

25   re-answer our initial complaint.

```
 1              THE COURT:  Yes.

 2              MR. HALL:  Your Honor, as a procedural matter, we

 3      have a lot of deadlines coming up.  We have discovery

 4      deadlines this month and next month and expert --

 5              THE COURT:  Do you want to advance them 20 days?

 6              MR. HALL:  Well, I don't think --

 7              THE COURT:  We can do that.  I assume that

 8      otherwise we're not delaying things.

 9              MR. HALL:  Your Honor, the Court is certainly not

10      delaying anything.  The litigant being what it is, to the

11      extent that we have not even known who the parties are to

12      this point, I simply don't see how we can meet any of these

13      deadlines.

14              THE COURT:  I don't know what these deadlines are.

15      If you need an adjustment on the deadlines, you're going to

16      have to either see if you can work out a stipulation in that

17      regard, which I would be glad to approve, or with the

18      magistrate judge, whoever is handling it, or file a motion.

19      I don't have that before me today.

20              MR. CONCANNON:  Yes.  I'm sorry to interrupt.

21              THE COURT:  No.

22              MR. CONCANNON:  I want to say in fairness to

23      everybody in the room, I think that we informally put a hold

24      on things because no one wanted to incur more costs

25      unnecessarily so nobody did anything wrong, and these guys
```

 1 didn't do anything wrong, the plaintiffs didn't do anything

 2 wrong, but Mr. Hall and I have to meet and talk about those

 3 deadlines which we are willing to do.  I have to get to the

 4 airport, but we'll do that.

 5          THE COURT:  If you can stipulate to an adjusted

 6 schedule, that makes sense in light of what you have put on

 7 hold, and I don't know anything about that, but you can send

 8 it directly to me and I will sign an order adopting your

 9 stipulation.

10          MR. CONCANNON:  Thank you.

11          MR. HALL:  And just start with the scheduling

12 order, Your Honor?  I mean, to make it easy on the Court,

13 just submit an entirely new scheduling order?

14          THE COURT:  If that is what you stipulate to.

15          MR. HALL:  Fair enough.

16          THE COURT:  I will approve anything that you can

17 agree on.

18          Yes, sir.

19          MR. DAVENPORT:  It probably goes without saying,

20 but I am assuming anything that is filed by way of the Blue

21 Water defendants will still be served upon all parties even

22 though the posture is taken back to the complaint.  In other

23 words, I want a copy of what he files so I can see if there

24 is a third-party complaint against my client or not.  I want

25 to know if there is not one, and --

1          THE COURT:  I would think if he is suing you,

2   you're going to find out about it.  There is still the

3   service requirements.  I'm not sure I understood the

4   question.

5          MR. DAVENPORT:  I just want to receive a copy of

6   whatever he files, so if he does not, then I can close my

7   case.

8          THE COURT:  Currently isn't your client still a

9   defendant?

10          MR. DAVENPORT:  Yes.

11          THE COURT:  Then I think you're going to get

12   everything.  I don't know why you wouldn't, so long as your

13   client is still a defendant.

14          We don't have a trial date?

15          MR. HALL:  I believe there is a 2015 trial date,

16   Your Honor, yes.  We are not seeking to disturb the trial

17   date.

18          THE COURT:  No, and I don't want to, but if I

19   could also give you a deadline for this amended scheduling

20   order, and it would be nice if we could have that within 20

21   days as well.

22          MR. CONCANNON:  Certainly.  We can do it in less

23   than that.

24          THE COURT:  Well, thank you for your arguments.

25          Court is in recess.

1          (Recess)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25